# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH<br><br>MARQUIS1960@ICLOUD.COM<br><br>THAT IS STORED AT PREMISES CONTROLLED BY APPLE, INC. | Case No. 1:21-mj-00027-JCN |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Bryan Klutzaritz, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the following Apple ID: marquis1960@icloud.com ("SUBJECT ACCOUNT #1") that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. I believe that SUBJECT ACCOUNT #1 is being used by Daquan Corbett, a/k/a "Chinx" (hereinafter "Corbett"). The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I have been a Special Agent with the Drug Enforcement Administration ("DEA") since 2003, and I am presently assigned to the Bangor, Maine, office. I

have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities.

3.     During my employment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including methamphetamine, cocaine, heroin, diverted pharmaceuticals and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 841(a)(1), 843, 846 and 856 (the "SUBJECT OFFENSES").[1] I have received training in the field of narcotics enforcement and investigations. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1), 843, 846 and 856 have been committed, are being committed, and will be committed by Corbett, and others known and unknown and that SUBJECT ACCOUNT #1 is being used to commit those offenses and contains evidence of the commission of those offenses, as described in Attachment B.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), &

---

[1] These provisions prohibit, generally, distribution and possession with the intent to distribute controlled substances, conspiracy to do the same, using communication facilities to do the same, and maintaining a drug involved premise.

2

(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.      I am conducting an investigation into the drug trafficking activities of Corbett, Danielle McBreairty, Sarah McBreairty, Daviston Jackson and others, who I believe have violated and are violating Title 21, United States Code, Sections 841(a)(1), 843, 846 and 856. As discussed below, the conspirators make frequent trips between Massachusetts and Maine, bringing drugs to Maine and proceeds from their sale back to Massachusetts. These trips are frequently made using vehicles rented in Massachusetts by Corbett. His use of SUBJECT ACCOUNT #1 is associated with business records concerning those rentals.

### Drug Trafficking Activities of Corbett and Others and Use of Electronic Devices to Facilitate the Same

8.      On December 12, 2019, I participated in a proffer interview with a Cooperating Defendant (CD).[2] In September of 2019, members of the Maine State Police stopped a vehicle on Interstate 95 being driven by CD. As a result of the traffic stop, officers seized approximately five (5) pounds of methamphetamine from the vehicle. During the proffer, CD advised he was bringing the methamphetamine to Bangor, Maine to an individual identified as Daviston Jackson. Prior to travelling to Maine, Jackson provided CD with his location via cell phone indicating

---

[2] CD is referred to in the masculine, regardless of actual gender. CD provided the information pursuant to a standard proffer agreement utilized by the U.S. Attorney's Office for the District of Maine. The agreement confers direct use immunity on all statements made by the proffering individual. CD was providing the proffer in hopes of consideration at the time of sentencing. No promises were made in this regard. CD has since been sentenced and received a sentence reduction due, in part, to a motion filed by the Government asking the Court to reduce his sentence on account of the cooperation.

where he was supposed to travel to in Maine. A search of CD's cellular telephone seized at the time of his arrest, revealed the message containing the location. An open source search of the GPS coordinates provided to Jackson indicated the location was in the vicinity of 67 First Street in Bangor, Maine.  During the post arrest interview of CD, CD provided telephone number (857) 498-4048 as a person who was in contact with him prior to his arrest. At the time, CD believed this telephone belonged to the person from whom he received the methamphetamine. As part of this investigation, I caused an administrative subpoena to be served to T-Mobile to obtain subscriber and toll information on the phone. T-Mobile records listed the subscriber of telephone (857)498-4048 as Daquan Corbett of 217 Country Club Lane, Brockton, Massachusetts.

      9.     On February 12, 2020, I participated in an interview with Bangor resident Carol Gordon. From reviewing records maintained by the Bangor Police Department (BPD) and speaking with officers with knowledge, I learned that BPD officers had responded to Gordon's apartment located at 67 First Street, Apartment 1, Bangor, Maine on November 18, 2019, for a 911 hang up. Upon contacting Gordon, officers also encountered Daviston Jackson in Gordon's apartment. During my interview with Gordon, I asked her about the incident and she told me that she knew the person in her apartment during that incident as "Matti." Gordon told me that "Matti" sold drugs, specifically, crack cocaine, heroin and methamphetamine. Gordon admitted she was a user of crack cocaine and further admitted "Matti" was selling narcotics from her apartment. Gordon stated she was supplied with crack cocaine for allowing people to sell narcotics from her residence. Gordon was shown a Massachusetts driver's license photo of Jackson from 2014. Gordon indicated she believed the person in the photograph was "Matti" but was unsure because "Matti" now had long dreadlocks. Gordon also indicated "Matti" was a worker for an individual going by the moniker "Chinx" and the group also had an association

with Ronald Spencer's apartment located at 66 Sanford Street, Apartment 2 in Bangor, Maine. Gordon provided telephone number (207) 631-3939 as a number used by "Chinx's" workers and she provided a second number for "Chinx" himself as (207) 977-7140. I served an administrative subpoena on (207) 977-7140 on T-Mobile to obtain subscriber and toll information on the aforementioned telephone and learned it was subscribed to by Jose Mendes of 14 Savin Street, Boston, Massachusetts.

10.     I have learned from reviewing incident reports and speaking with involved officers that on February 27, 2020, Danielle McBreairty was arrested by members of the Maine Drug Enforcement Agency (MDEA) in Topsham, Maine after a controlled purchase of methamphetamine. A state search warrant was later obtained for a locked bag in the car which was found to contain approximately four (4) pounds of methamphetamine and one (1) pound of an unknown powder. Danielle McBreairty identified a white iPhone in the vehicle as hers at the time of her arrest. Members of the MDEA later applied for and received a state search warrant for the phone identified by Danielle McBreairty. Pursuant to the search warrant, the iPhone was forensically examined and a copy of its contents downloaded.

11.     In March 2020, I was provided a copy of the forensic download of Danielle McBreairty's cellular telephone bearing telephone number (207) 478-4610. Upon reviewing information seized from the phone, I observed text message communication between Danielle McBreairty's telephone and (207) 631-3939 on February 22, 2020. Danielle McBreairty labeled (207) 631-3939 as "The Brothers" in her phone. At the beginning of the text conversation, the user of (207) 631-3939 identified himself as "Matty." I believe this is the same moniker that was provided by Gordon even though at the time agents believed Gordon was saying "Matti." As stated in paragraph 9, Gordon provided (207) 631-3939 as the number used by "Chinx's

workers."

12.     I am familiar with Danielle McBreairty and her sister, Sarah McBreairty from other ongoing federal and state investigations involving the distribution of methamphetamine in and around the greater Bangor area and New Hampshire. In this regard, I was present during a consent search of Danielle McBreairty's apartment in the Bangor area on January 6, 2020, when methamphetamine was found at that location, together with other evidence indicating she was involved in large scale methamphetamine trafficking. In addition, when I reviewed the text messages from Danielle McBreairty's telephone, I observed several text messages between her telephone and the telephone number that Carol Gordon provided for "Chinx" (207) 977-7140 that, based on my training and experience, I recognized as being related to narcotics trafficking. Therefore, I have reason to believe the organization being run by "Chinx" was supplying Danielle McBreairty with methamphetamine.

13.     On April 7, 2020, I observed Danielle McBreairty leaving 66 Sanford Street, Bangor, Maine. The address, specifically Apartment #2, was identified as being associated with the "Chinx" organization during my interview with Carol Gordon. See Paragraph 9. I have conducted surveillance of this location and observed vehicles parked outside the Sanford Street residence believed to have been rented by members of the "Chinx" organization, including vehicles rented by both Corbett and Daviston Jackson.

### Identification of Marquis1960@icloud.com Account and Frequent Use of Rental Cars by Corbett to Facilitate Drug Trafficking Activities

14.     In November 2020, I served an administration subpoena on EAN Holdings. EAN Holdings is a rental car corporation consisting of Enterprise, Alamo and National rental cars. I was attempting to identify rentals by Corbett and others involved in this investigation from

September 1, 2020, to November 3, 2020. EAN Holdings identified fifteen (15) vehicles rented in Corbett's name during the requested time frame. Within the business records provided by EAN Holdings, it was learned Daquan Corbett provided an email address of marquis1960@icloud.com in the driver profile of each rental. I know from reviewing the criminal history of Daquan Corbett that his middle name is Marquis. I have spoken to Maine State Police troopers involved in a traffic stop of Corbett and Jackson on September 12, 2020, where $57,255.00 in suspected drug proceeds were seized from their rental vehicle. During the stop troopers advised that Jackson referred to Corbett as "Marquis." The vehicle in which Corbett and Jackson were stopped in was registered to EAN Holdings and was rented by Corbett.

15.    Based on my knowledge of this investigation, I know Corbett primarily rents vehicles through EAN Holdings. I have also identified one rental car in the name of Corbett thus far from Hertz rental car which was observed at Sanford Street on March 24, 2020. Surveillance conducted at Corbett's residence in Quincy, Massachusetts has identified multiple rental cars at the residence which were rented by Corbett and his associates. Several of these vehicles have also been observed in the vicinity of 66 Sanford Street in Bangor, Maine to include the one where $57,255.00 was seized. Approximately thirty (30) vehicles were identified as being rented by Corbett and/or his associates from September 1, 2020, to November 3, 2020. Based on my training and experience, I know people involved in narcotics trafficking frequently utilize rental cars to prevent detection by law enforcement and as way to further their illicit activities. I know sometimes people involved in drug trafficking have associates rent vehicles to prevent law enforcement from seizing assets and as a way to prevent their name from being associated with a vehicle registration if observed or stopped by law enforcement. I believe Corbett and his associates frequently utilize rental vehicles as a key component to their operation involving the

transportation of narcotics and drug proceeds between the Boston, Massachusetts area and Maine as indicated by the numerous rentals.

### Identification of Telephones Used by Daquan Corbett and Pertinent Text Messages Captured from the Execution of Federal Search Warrants

16.     During the course of this investigation, several telephone numbers have been identified that I believed were used by Corbett, including (207) 977-7140, (207) 900-9192, (207) 806-6099 and (207) 618-3337. Administrative subpoenas were severed on the carrier (T-Mobile) to obtain subscriber and toll information for these numbers. Subscriber information for (207) 977-7140 and (207) 900-9192 listed the subscriber of these phones as Jose Mendes of 14 Savin Street, Boston, Massachusetts. Subscriber information for (207) 806-6099 and (207) 618-3337 revealed the phones were both subscribed to by Jose Mendez of 28 Savin Street, Roxbury, Massachusetts. Based on my training and experience, I know people involved in using telephones for illicit activity will register phones and other means of communication in fictitious names or addresses to thwart law enforcement efforts to identify the user of the communication devices and will frequently "rotate" phones. I believe the four phones above are an example of this activity. I have searched proprietary law enforcement databases (e.g., CLEAR and Accurint) to identify a Jose Mendez (Mendes) at either Savin Street location without success.

17.     During this investigation, I identified recorded telephone calls between Danielle McBreairty, who was incarcerated at the Penobscot County Jail at the time, and telephone (207) 806-6099. A review of the telephone calls indicated the conversations were primarily involving the collection of U.S. Currency to bail Danielle McBreairty out of jail from her most recent arrest. The calls also discuss Danielle McBreairty, her sister Sarah McBreairty and associates along with difficulties encountered trying to coordinate the collection of bail money.

8

18.     On September 14, 2020, at a time when telephone number (207) 806-6099 was the subject of a court-authorized geo-location search warrant that allowed me to monitor the movements of the telephone, I requested the Maine State Police to locate the vehicle in which the telephone was traveling. Earlier in the day, the telephone had been in Bangor and Aroostook County. The state police were able to locate the vehicle and stopped it for a moving violation. As a result of the roadside investigation following the traffic stop members of the Maine State Police seized $57,255.00 in suspected drug proceeds from the vehicle at the request of DEA. The vehicle was occupied by Corbett and Jackson at the time of the stop. I have reviewed the audio recording from the stop and the voice using (207) 806-6099 to speak with Danielle McBreairty at the Penobscot County Jail. I believe the voice of Daquan Corbett is the same as the person utilizing (207) 806-6099. I also believe Corbett is the person utilizing the moniker "Chinx" and a narcotics source of supply in this investigation.

19.     Additionally, I have executed multiple search warrants authorized by this court for text message content of Verizon Wireless telephones utilized by both Danielle McBreairty and her sister, Sarah McBreairty. During a review of the information received from Verizon Wireless several pertinent messages were identified with phones which I believe were used by Corbett. For instance, on May 16, 2020, I received the results of a search warrant on telephone (207) 401-0179, a phone I believed was used by Danielle McBreairty. I discovered numerous drug related text messages with (207) 806-6099. I discovered that on June 20, 2020, (207) 401-0179 and (207) 806-6099 exchanged a series of messages where Danielle McBreairty tells (207) 806-6099, "I have 10 stacks." Telephone (207) 806-6099 responds, "Ok finding a ride now." Based on my training and experience I know "stacks" is a term used for $1,000.00. I believe this is evidence of Danielle McBreairty having $10,000.00 for the user of (207) 806-6099 to collect

9

which were derived from the sale of narcotics.

20.    On June 22, 2020, telephone (207) 401-0179 (in context Danielle McBreairty) sent a text to (207) 806-6099, "Hey yeah I'm good. 32 oz is what was there." The person using (207) 806-6099 responded to (207) 401-0179, "I know they doing it by the p now. Based on my training and experience I know that people involved in methamphetamine trafficking frequently sell large amounts in pound quantities. When the person using (207) 806-6099 references "p" I believe the user is talking to Danielle McBreairty about pound quantities of methamphetamine.

21.    As part of this investigation, I also executed two text message search warrants on telephone number (207) 631-8475, a telephone number used by Sarah McBreairty. Both search warrants produced drug related pertinent text messages with (207) 618-3337, a number I believe is currently being used by Corbett which is also the subject of an active pen register authorized by this court. On January 25, 2020, I received the results of the second text message search warrant authorized by this court on Sarah McBreairty's cellular telephone of (207) 618-3337.

22.    On January 2, 2021, a series of drug related text messages occurred between telephone (207) 631-8475 and (207) 618-3337. At approximately 3:56 p.m., telephone (207) 631-8475 sent a text message to (207) 618-3337, "Im up to 40 now.. Still counting." Telephone (207) 618-3337 responded, "Ok On my way!" Shortly thereafter, telephone (207) 631-8475 responded, "With one more up I hope...lol." Telephone (207) 618-3337 responded, "Yea I brought one." Based on my training and experience, I believe this message thread indicates Sarah McBreairty was counting $40,000.00 in U.S. Currency and when the user of (207) 618-3337 indicated "yeah I brought one" denotes one pound of methamphetamine was being brought to Maine. Later in the day, approximately four hours later, at approximately 8:12 p.m., (207) 631-8475 received a text from (207) 618-3337, advising Sarah McBreairty to "put the dog up please."

10

I believe this message indicates the user of (207) 617-3337 arrived at Sarah McBreairty's residence approximately four hours later, the approximate length of time to travel from the Boston, Massachusetts area and Bangor, Maine.

23.     Based on my knowledge of this investigation along with my training and experience, I believe Daquan Corbett has utilized multiple phone numbers to facilitate his drug trafficking actives in the Bangor, Maine area to include the most recent number of (207) 618-3337. I believe Corbett frequently travels to the Bangor area to supply narcotics to Sarah McBreairty as indicated in the multiple messages on different phones detailed above.

### Use of the SUBJECT ACCOUNT #1
### (marquis1960@icloud.com)

24.     As set forth below, I believe SUBJECT ACCOUNT #1 is used by Daquan Corbett who, as set forth above, has used cellular telephones to communicate in furtherance of the SUBJECT OFFENSES.

25.     Based on my review of records obtained from Apple, I am aware that SUBJECT ACCOUNT #1 was linked to several Apple iPhones, all which list the "contact name" for the account as "Dr. Marquis Loatman" with a street address of 97 Division Street,[3] Brockton, Massachusetts and a business phone number of (857) 498-4048. The phones with telephone number (857) 498-4048 were associated with the account in May and August of 2018.

26.     I have searched several databases containing public information for the name of Marquis Loatman associated with 97 Division Street in Brockton, Massachusetts. I was unable to

_____

[3] Based on information obtained from Apple, 97 Division Street was identified as the address associated with the SUBJECT ACCOUNT #1 on May 17, 2018, May 23, 2018, and August 8, 2018.

associate the name Marquis Loatman with the address or any address in Massachusetts.[4] While

conducting these searches I found several individuals with the last name of Corbett associated

with the 97 Division Street address to include Daquan Corbett. Another name identified

associated with the address was Dorothy James A/K/A Dorothy Corbett. Based on my

knowledge of this investigation, I believe Dorothy James is the mother of Daquan Corbett.

Through researching proprietary law enforcement databases (e.g., CLEAR and Accurint), I

learned that Dorothy James is currently the owner of 217 County Club Lane in Brockton,

Massachusetts. Daquan Corbett lists 217 Country Club Lane as his residence on his driver's

license.

27.      Additionally, as stated in paragraph 8, _supra_, as part of this investigation, I caused

an administrative subpoena to be served to T-Mobile on October 25, 2019, to obtain subscriber

and toll information on the phone. T-Mobile records listed the subscriber of telephone (857) 498-

4048 as Daquan Corbett of 217 Country Club Lane, Brockton, Massachusetts. I have conducted

toll analysis on telephone number (857) 498-4048. During a review of telephones in contact with

(857) 498-4048, I identified approximately 20 calls to telephone (857) 654-3105 between August

26, 2019 and September 19, 2019. Telephone number (857) 654-3105 is subscribed in the name

of Daviston Jackson of 280 Humboldt Ave., Boston, Massachusetts and 19 Ellsworth Ave.,

Brockton, Massachusetts. In addition to the Jackson phone, there were approximately 88 calls to

a phone subscribed to by Gradie James of 97 Division Street in Brockton, Massachusetts

---

[4] As previously discussed, Corbett's middle name is Marquis. See ¶14, _supra_. I have also queried
the Commonwealth of Massachusetts Board of Registration in Medicine and confirmed that there
are no licensed doctors in Massachusetts named Marquis Loatman. Based on my training and
experience and involvement in this investigation, I believe that Corbett used the fictitious name
"Dr. Marquis Loatman" to establish the account.

between August 25, 2019 and September 23, 2019. The phone subscribed to by Gradie James ((774) 776-5200) also appeared as a contact on Corbett's telephone (207) 806-6099 with approximately four calls on July 15, 2020.

28.     Based on the foregoing, I believe Corbett is the user of SUBJECT ACCOUNT #1 and has used SUBJECT ACCOUNT #1 to commit the SUBJECT OFFENSES and that evidence of those crimes will be found in SUBJECT ACCOUNT #1. More specifically, I believe that Corbett once used the telephone number (857) 498-4048 associated with SUBJECT ACCOUNT #1 to communicate with individuals involved in the distribution of narcotics in Maine.

29.     The Apple records for SUBJECT ACCOUNT #1 show that "marquis1960@icloud.com" is an email address connected to SUBJECT ACCOUNT #1 as the login email for SUBJECT ACCOUNT #1. Based on the forgoing discussion, I believe this email address is being used by Corbett to enable his Apple devices to sync with the digital services available under SUBJECT ACCOUNT #1.

## INFORMATION REGARDING APPLE ID AND iCLOUD[5]

30.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

---

[5] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

31.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.     iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps.

d.     iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and

presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.   Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.   Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.   Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.   App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

32.   Apple services are accessed using an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

33.   An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a

15

third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to
access most Apple services (including iCloud, iMessage, and FaceTime) only after the user
accesses and responds to a "verification email" sent by Apple to that "primary" email address.
Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be
associated with an Apple ID by the user.

34.     Apple captures information associated with the creation and use of an Apple ID.
During the creation of an Apple ID, the user must provide basic personal information including
the user's full name, physical address, and telephone numbers. The user may also provide means
of payment for products offered by Apple. The subscriber information and password associated
with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on
Apple's website. In addition, Apple captures the date on which the account was created, the
length of service, records of log-in times and durations, the types of service utilized, the status of
the account (including whether the account is inactive or closed), the methods used to connect to
and utilize the account, the Internet Protocol address ("IP address") used to register and access
the account, and other log files that reflect usage of the account.

35.     Additional information is captured by Apple in connection with the use of an
Apple ID to access certain services. For example, Apple maintains connection logs with IP
addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App
Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple
also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call
invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over
an Apple-provided email account. Records relating to the use of the Find My iPhone service,

including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

36.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

37.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders,

notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

38.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

39.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

40.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and

because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

41.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

42.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

43.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

44.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information

(including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

45.     Based on the forgoing, I request that the Court issue the proposed search warrant.

46.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

47.     The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

48.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the

targets of the investigation. Accordingly, there is good cause to seal these documents because

their premature disclosure may seriously jeopardize that investigation.

Bryan Klutzarlt
Special Agent
Drug Enforcement Administration

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date:   Feb 04 2021

City and state:   Bangor, ME

_Judge's signature_
John C Nivison U.S. Magistrate Judge
_Printed name and title_

21